IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*<br><br>-vs-<br><br>CRISTOBAL PEREZ HERNANDEZ,<br>*Defendant* | §<br>§<br>§   SA-19-CR-00226-XR<br>§<br>§<br>§<br>§<br>§ |

**ORDER**

On this date, the Court considered Defendant Cristobal Perez Hernandez's motion to suppress (ECF No. 42), the Government's response (ECF No. 47), and the post-hearing briefing ECF No. 55). After careful consideration, the Court issues the following order.

**BACKGROUND**

Defendant Cristobal Hernandez is charged in the Indictment with knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii). ECF No. 12 at 1.

On March 5, 2019, Texas Department of Public Safety Trooper Adam Garza was on patrol in San Antonio, Texas, when he observed a gray Nissan Sentra that displayed a Nuevo Leon license plate travelling southbound on Loop 410. ECF No. 1 ¶ 4. Trooper Garza noticed that the Nissan was following the vehicle in front of it too closely, in violation of Section 545.062(a) of the Texas Transportation Code and activated his lights and sirens. *Id.* After proceeding for several miles, exiting Loop 410, and proceeding onto IH-35, the Nissan finally stopped on the side of IH-35, just before Exit 144. *Id.*

Trooper Garza approached the vehicle on the passenger side, requested identification, and explained the reason for the stop. ECF No. 47 ¶ 2. Both the driver, Defendant Hernandez, and the passenger, Myriam Eninia Perez spoke Spanish as their primary language. *Id.* Trooper Garza speaks some Spanish but is neither fluent nor proficient in the language. *Id.* Despite this, Trooper Garza identified Defendant through his Nuevo Leon driver's license and the passenger through her Mexico Voter Credential Card. *Id.* Trooper Garza also learned at that time the two were supposedly cousins. *Id.* at 3.

According to a video recording of the stop and search, Trooper Garza directed Defendant to accompany him to his marked unit by saying "Señor, pasele aca… es muy frio (Sir, come here… it's very cold)... come back here… sientate es [sic] mi carro (sit in my car)... para un aviso (for a warning)." ECF No. 42 ¶ 2. Trooper Garza testified that he made this request because he was having difficulty understanding Defendant due to IH-35 traffic noise and his limited proficiency in Spanish. ECF No. 47 ¶ 3. Trooper Garza requested the assistance of a fluent Spanish speaker to aid in the seven-step procedure for conducting a traffic stop. *Id.* Around five minutes later, Trooper Ruiz arrived on the scene and began to speak with Defendant and translate for Trooper Garza. *Id.*

Trooper Ruiz asked Defendant where he was coming from and where he was going. *Id.* Defendant responded that he and Ms. Perez had crossed from Mexico into the United States several days earlier, had stayed in a Best Western in San Antonio and spent time shopping in San Antonio and San Marcos, and were at that time headed back to Mexico. *Id.* Trooper Garza observed that Defendant's carotid artery began to swell as he spoke, which Trooper Garza believed to be an indicator that Defendant's heartbeat had increased dramatically during questioning. *Id.* at 3–4. Trooper Ruiz then spoke with Ms. Perez who told him that the two had come from Dallas where

2

they had visited family. *Id.* at 4. When asked, she did not mention shopping at the outlets in San Marcos. *Id.*

After Defendant and his passenger delivered conflicting stories, Trooper Ruiz proceeded to ask Defendant if there was anything illegal in the vehicle. *Id.* Trooper Garza observed on Defendant "a look of shock as if he had been caught" when he mentioned methamphetamine in a list of various illegal narcotics. *Id.* Defendant denied any illegal activity. *Id.* Trooper Ruiz then asked Defendant for permission to search the vehicle. *Id.* Defendant gave verbal consent to the search. *Id.* This occurred sixteen minutes into the stop, and around ten minutes after Trooper Ruiz arrived at the scene. *Id.*

Because Trooper Garza's K-9 had been injured earlier that day, Trooper Garza requested that his Sergeant, Schooley, who was already on the scene, use his K-9. *Id.* Sergeant Schooley agreed, allowed his K-9 to take a bathroom break, and began the sniff of the vehicle around five minutes after verbal consent had been given. *Id.*

Sergeant Schooley's K-9 alerted to the presence of narcotics, leading the Troopers to begin a search of the vehicle. *Id.* The Troopers observed an abnormal amount of what they thought to be 'bondo' at the door junctions of both the driver's and passenger's sides. *Id.* The Troopers knew that it is common for drugs to be stored in compartments near such junctions within a vehicle's body due to their training and experience. *Id.* at 4–5. Based on (1) the Mexican license plate, (2) the inconsistent travel stories, (3) Defendant's behavioral changes at the mention of methamphetamine, (4) the alert of the K-9 to the presence of narcotics, and (5) the appearance of what seemed to be automotive body changes to the vehicle, the Troopers then transported the vehicle to a nearby "Luvs" gas station to investigate the area of the vehicle where the 'bondo' was

3

present. *Id.* at 5. This occurred approximately fifteen minutes after the search of the vehicle had commenced, and 35 minutes into the traffic stop. *Id.*

During the inspection of the vehicle at the gas station, the front passenger tire and inner plastic fender of the vehicle were removed to provide access to the rocker panel area. *Id.* Trooper Garza found that the bondo in that area of the vehicle felt soft and that beneath the bondo there appeared to be a metal plate that moved when pressure was applied. *Id.* When the metal plate was removed, the Troopers discovered fifteen packages of methamphetamine in the passenger side rocker panel and another fifteen packages in the driver's side rocker panel. *Id.* In all, the Troopers confiscated 24.5 kilograms of methamphetamine from the vehicle. *Id.* At no time during the search of the vehicle did Defendant ask the Troopers to stop the search or in any other way withdraw his consent. *Id.* The entirety of the stop lasted for approximately 50 minutes. ECF No. 42 ¶ 4.

## ANALYSIS

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. CONST. amend. IV. Because a routine traffic stop and subsequent detention implicates the Fourth Amendment as a seizure, the stop is considered a *Terry* stop, and must be limited. *Terry v. Ohio,* 392 U.S. 1 (1968). Determining the legality of such *Terry* stops requires a two-part test: (1) whether the officer's action was justified at its inception, and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) (quoting *Terry,* 392 U.S. at 19–20). Once the purpose of the valid traffic stop has been completed, the detention or investigative stop must end unless there are additional reasonable suspicions supported by objective and articulated facts. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003).

Defendant disputes that his detention during the stop was reasonably related in scope to the reasons articulated for the initial stop. *See* ECF No. 42.

**A.    The initial traffic stop was justified.**

The reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. *Whren v. United States*, 517 U.S. 806, 813 (1996). "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *Id.* "A traffic stop is justified at its inception if an officer has 'an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle.'" *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010).

Defendant argues[1] that Trooper Garza's initial stop was unlawful because it is not apparent from the video that Defendant was following too closely the vehicle in front of him. The video angles appear to indicate that the vehicles were close, and Trooper Garza reported that he personally saw Defendant following too closely to the vehicle in front of him, thus violating TEX. TRANSP. CODE § 545.062(a) ("An operator shall, if following another vehicle, maintain an assured clear distance between the two vehicles"). Defendant presented no evidence, other than conclusory statements, to rebut Trooper Garza's report. The Court thus concludes that Trooper Garza was justified in stopping Defendant for violating TEX. TRANSP. CODE § 545.062(a).

**B.    The questioning was reasonably related in scope to the circumstances of the traffic stop.**

Beginning with *Terry*, 466 U.S. at 104, "the [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity

---

[1] Defendant has withdrawn this argument in his post-hearing brief. *See* ECF No. 55.

permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt City*, 542 U.S. 177, 185 (2004). The Court must analyze reasonableness through the specific facts and circumstances of each case while also considering the experience and training of officers to "determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d at 507. A detention must "last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* Thus, under the second prong of the *Terry* test, the Court must ask whether the Troopers' actions after Trooper Garza legitimately stopped Defendant's vehicle were reasonably related to the circumstances that justified the stop, or to dispelling the Troopers' reasonable suspicions that developed during the stop.

<u>Timing of Detention</u>

Defendant argues that upon approaching the driver, Trooper Garza notified the driver he was stopped as a warning, and that after securing the driver's Mexican identification there was no need to conduct a computer check of the driver's identity because that was a meaningless exercise given that Texas DPS computer records are unable to ascertain information on Mexican identification cards. Defendant argues that this identification check was merely done pretextually to prolong the stop. The Court disagrees. Although the Trooper would not be able to obtain any data directly from his vehicle's computer on a foreign license plate, Trooper Garza testified that transmitting this information was reasonable inasmuch as DPS and law enforcement officers may require this information if a stop goes badly and the vehicle may have to be later identified. With regard to any identification card information, the dispatcher has access to databases that he does not. The transmission of this information to the dispatcher is part of a reasonable traffic stop.

Accordingly, this is not a case in which the Trooper unreasonably detained Defendant by continuing his questioning after the warning was completed. *See United States v. Jones*, 234 F.3d 234 (5th Cir. 2000); *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999). In that line of cases, the officer had completed the initial justification for the stop either by writing out and handing over a citation, or completing a computer check on a driver's license. *United States v. Garcia Cantu*, No. SA-04-CR-405-XR, 2004 WL 2397613, at *3 (W.D. Tex. Oct. 26, 2004). In those cases, the officer could not articulate a reasonable suspicion of criminal activity and the purpose of the initial traffic stop had been completed. *Id.* Thus, in those cases the officer's continued detention and questioning of the individuals unreasonably prolonged the traffic stop. *Id.*

In this case, the Troopers asked customary questions concerning travel plans and possession of illegal objects while in the process of issuing a warning. *See United States v. Pack*, 612 F.3d 341, 351 (5th Cir.), opinion modified on denial of reh'g, 622 F.3d 383 (5th Cir. 2010) ("An officer may . . . ask about the purpose and itinerary of a driver's trip during [a] traffic stop. We also stated that "the Fourth Amendment permits '[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.") (internal citations omitted). The DPS dispatcher in this case had not yet returned any information regarding the Defendant's identification information.[2]

The Trooper articulated a reasonable suspicion of criminal activity based on the inconsistent travel stories, and a change in Defendant's demeanor at the mention of methamphetamine. The Troopers' detention of Defendant occurred within a reasonable timeframe.

---

[2] Defendant argues that the Government failed to provide any information regarding what database the dispatcher may have been trying to access and how long it would customarily take to complete such a search and inform a Trooper of the results. This is an accurate statement. Trooper Garza testified that he was unable to provide an estimate because it depended on the dispatcher. Nevertheless, the Court concludes that the Trooper articulated a reasonable suspicion of criminal activity during the applicable sixteen minutes timeframe of this stop.

Reasonableness of Extended Detention

Next, a court making the assessment of whether the stop has exceeded the scope of its initial justification, "should take care to consider whether the police are acting in a swiftly developing situation and in such cases the Court should not indulge in unrealistic second-guessing." *Garcia Cantu,* 2004 WL 2397613, at *4 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Defendant argues that the Troopers did not act swiftly, but instead extended his detention unlawfully. It is true that the detention lasted for approximately 50 minutes, and that the methamphetamine in question was discovered around 50 minutes after Defendant was told he would be receiving a warning. However, this delay was justified by the circumstances.

A five-minute delay arose based on the need for a second trooper who spoke Spanish fluently to arrive to ensure that (1) Defendant understood the reason for the traffic stop, (2) Defendant understood that he was to receive a warning rather than a traffic ticket, (3) Defendant was issued the warning for following too closely, and (4) the seven-step procedure for conducting a traffic stop[3] could be completed.

A second five-minute delay arose due to the need to switch out K-9s, as Trooper Garza's K-9 had been injured, and the customary procedure of allowing the K-9 to take a bathroom break before the search. The remainder of the detention was extended based on the nature of the Troopers' findings. At the alert of the K-9 and the sight of the bondo, it was reasonable and necessary for the Troopers to transport the vehicle to a gas station and to perform the extended procedure of removing panels on the vehicle to determine if anything was hidden behind them. The Troopers' training and experience along with the factors giving rise to suspicion indicated that

---

[3] https://www.dps.texas.gov/section/highway-patrol/travel-tips

8

Defendant was transporting methamphetamine or another type of drug. Thus, each delay was appropriate given the circumstances, and the Troopers did not unreasonably prolong Defendant's detention.

    Reasonable Suspicion

    Finally, a Court must consider that, while officers must "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," the suspicion required to justify a detention must arise from more than an unparticularized suspicion or hunch. *Garcia Cantu,* 2004 WL 2397613, at *4 (quoting (*United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted)). Here, the Trooper did not merely articulate a "hunch" that Defendant was involved in further criminal activity. Instead, suspicions arose prior to the stop when Defendant did not pull over initially and increased throughout a chain of events that occurred during the traffic stop. *See United States v. Rodriguez*, 802 F. App'x 90, 97 (5th Cir. 2020). "Reasonable suspicion demands something more than a 'mere hunch' but considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Smith*, 952 F.3d 642, 648 (5th Cir. 2020).

    The Defendant and Ms. Perez offered inconsistent stories about their recent travels and their relationship. An officer may ask about the purpose and itinerary of a driver's trip during the traffic stop to determine whether a citation or warning should be issued, or an arrest made. *Brigham*, 382 F.3d at 508. Further, the Fourth Amendment permits "[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver." *Id.* (quoting *United States v. Linkous*, 285 F.3d 716 (8th Cir. 2002)).

Additionally, the Troopers observed behavioral changes in Defendant at the mention of methamphetamine. The Supreme Court has emphasized the importance of allowing officers to "draw on their own experience and specialized training to make inferences" from the facts available to them. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Thus, the Trooper was justified in relying on his experiences to infer that Defendant was hiding narcotics in his vehicle. *Brigham,* 382 F.3d at 508.

**Defendant voluntarily consented to the search of the vehicle.**

Consent serves as an exception to the Fourth Amendment's requirement that searches be supported by warrants. *Davis v. United States,* 328 U.S. 582, 593-594 (1946). "The government must prove, by a preponderance of the evidence, that consent was freely and voluntarily given." *United States v. Tompkins,* 130 F.3d 117, 121 (5th Cir. 1997). Consent is not voluntary if it "was the product of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973).

"Although . . . no single factor is dispositive or controlling," *United States v. Mendez,* 431 F.3d 420, 429 (5th Cir. 2005), the Fifth Circuit has identified six factors that courts should consider in evaluating the voluntariness of an act of consent: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Olivier-Becerril,* 861 F.2d 424, 426 (5th Cir. 1988).

The evidence establishes that Defendant operated with a high level of cooperation with the Troopers. Defendant proceeded to Trooper Garza's marked unit when asked and sat in the front

passenger seat. No handcuffs were needed at any point. As for Defendant's awareness of his right to refuse to consent considering his education and intelligence, at minimum, the Troopers attempted to ensure that Defendant fully understood the procedure by providing a translator. Finally, Defendant's shocked response and swollen carotid artery at the mention of methamphetamine, along with the conflicting stories from Defendant and Ms. Perez, suggest that he could not have believed that no incriminating evidence would be found during the search.

Defendant argues that being away from his own vehicle, the continued possession of his license by a Trooper, the presence of multiple law enforcement officers, and the questioning about general crimes "would have led any person in [his] shoes to believe that he could no longer . . . deny consent to search his vehicle." ECF No. 42 ¶ 8. However, each of these circumstances is not uncharacteristic of a typical traffic stop. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (holding that a defendant's consent was voluntary though the law enforcement officer maintained possession of the defendant's license); *United States v. Pointer,* 159 F. App'x 565, 566 (5th Cir. 2005) (holding that a Sergeant's questioning of facts unrelated to the initial traffic stop was not a Constitutional violation); *Pennsylvania v. Mimms,* 434 U.S. 106 (1977) (holding a traffic stop conducted by multiple officers to be lawful and non-coercive). The Troopers did not employ any coercive techniques to obtain consent. Defendant freely and voluntarily gave consent to search when asked.

The Court concludes that, based on the totality of the circumstances, Defendant consented to the K-9 search and search of his vehicle voluntarily. Because the Troopers' questioning did not violate the Fourth Amendment, Defendant's consent to search was not unconstitutionally tainted, and the *Terry* stop detention was permissible under *Brigham.* 382 F.3d at 512.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (ECF No. 42) is **DENIED**.

It is so **ORDERED**.

SIGNED this 10th day of August, 2021.

> XAVIER RODRIGUEZ
> UNITED STATES DISTRICT JUDGE